2012 WY 142

**BOARD OF PROFESSIONAL RE-SPONSIBILITY, WYOMING STATE BAR, Petitioner,**

v.

**Dion J. CUSTIS, WSB # 6–2674, Respondent.**

No. D–12–0008.

Supreme Court of Wyoming.

Nov. 7, 2012.

## ORDER OF PUBLIC CENSURE

[¶ 1]   **This matter** came before the Court upon a "Report and Recommendation for Public Censure," filed herein August 29, 2012, by the Board of Professional Responsibility for the Wyoming State Bar. The Court, after a careful review of the Board of Professional Responsibility's Report and Recommendation, the "Respondent's Brief," and the file, finds that the Report and Recommendation should be approved, confirmed and adopted by the Court, and that Respondent Dion J. Custis should be publicly censured for his conduct, which is described in the attached Report and Recommendation for Public Censure.  It is, therefore,

[¶ 2]   **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's Report and Recommendation for Public Censure, which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court;  and it is further

[¶ 3]   **ADJUDGED AND ORDERED** that Dion J. Custis is hereby publicly censured for his conduct;  and it is further

[¶ 4]   **ORDERED** that, on or before December 31, 2012, Mr. Custis shall complete four (4) hours of continuing legal education on the subject of ethics;  and it is further

[¶ 5]   **ORDERED** that, pursuant to Section 26 of the Disciplinary Code for the Wyoming State Bar, Mr. Custis shall reimburse the Wyoming State Bar the amount of $11,897.60, representing the costs incurred in handling this matter, as well as pay the administrative fee of $500.00.  Mr. Custis shall pay the total amount of $12,397.60 to the Clerk of the Board of Professional Responsibility on or before December 31, 2012;  and it is further

[¶ 6]   **ORDERED** that the Clerk of this Court shall docket this Order of Public Censure, along with the incorporated Report and Recommendation for Public Censure, as a matter coming regularly before this Court as a public record;  and it is further

[¶ 7]   **ORDERED** that, pursuant to Section 4(a)(iv) of the Disciplinary Code for the Wyoming State Bar, this Order of Public Censure, along with the incorporated Report and Recommendation for Public Censure, shall be published in the Wyoming Reporter and the Pacific Reporter;  and it is further

[¶ 8]   **ORDERED** that the Clerk of this Court cause a copy of this Order of Public Censure to be served upon Respondent Dion J. Custis.

BY THE COURT: *

/s/ MARILYN S. KITE
MARILYN S. KITE
Chief Justice

D–12–0008

## BEFORE THE SUPREME COURT

## STATE OF WYOMING

IN THE MATTER OF DION J. CUSTIS WSB # 6–2674, Respondent.

WSB No. 2001–131

## REPORT AND RECOMMENDATION FOR PUBLIC CENSURE

THIS MATTER having come before the Board of Professional Responsibility of the

---

* Justice Davis took no part in the consideration of this matter.  Retired Justice Michael Golden par-   ticipated by assignment.

Wyoming State Bar for hearing on May 11, 2012, and July 11, 2012, and the Board having received certain exhibits into evidence, having heard the testimony of numerous witnesses, having reviewed the briefing and arguments of counsel and being fully advised in the premises, FINDS, CONCLUDES AND RECOMMENDS as follows:

### Findings of Fact

1. Respondent was the public defender appointed to represent a 45–year–old male ("Respondent's client") who was accused of sexually abusing his niece over a two-year period that began when the girl was six years old. The abuse began in 2006, when Respondent's client was recuperating from a motorcycle accident in quarters provided by the sister and brother-in-law of Respondent's client, who were the parents of the young sexual abuse victim. The abuse was not discovered until 2009 (a year or so after Respondent's client left Cheyenne and returned to California), when the girl started talking about her sexual contact with her uncle.

2. Respondent's client was arrested and extradited to Wyoming in early 2010. He had multiple prior felony convictions.

3. After his motorcycle accident and before his arrest, Respondent's client had sued a Laramie County sheriff's deputy for pulling out in front of him and causing the crash. Respondent's client was represented in the personal injury action by attorneys Robert Reese of Green River and Donald J. Sullivan of Cheyenne.

4. The personal injury case was tried in federal court in Casper in the spring of 2009. Respondent's client traveled from California to Casper for a bench trial before the Honorable William F. Downes, United States District Court Judge; then returned to California where he waited for Judge Downes' decision. It would not come for nearly two years.

5. While Respondent's client waited for Judge Downes' decision, his niece, now approaching age ten, told her mother what her uncle had done to her. Respondent's client was arrested in California and extradited to Wyoming, and Respondent was appointed as his public defender. Respondent's client spent more than a year in jail in Cheyenne while his criminal case worked its way through the docket and Judge Downes worked on his decision in the personal injury case.

6. In March of 2011, Respondent and his client signed a written plea agreement with the District Attorney by which (1) Respondent agreed to plead guilty to First Degree Sexual Abuse of a Minor Under 13 Years of Age; (2) the State would recommend a sentence of 12 to 22 years; and (3) Respondent would not attempt to argue to the Court for a lesser sentence. See Exhibit A.

7. Approximately two weeks after the plea agreement was signed, Respondent received word of a $250,000 award in the personal injury case. See Exhibit B.

8. After Judge Downes issued the award, Respondent called his client's sister (the sexual abuse victim's mother), and offered a $15,000 inducement (couched as "future restitution") in exchange for the mother's agreement to recommend to the Court that Respondent's client receive a suspended sentence and no prison time. The offer was conditioned on the mother successfully persuading the District Attorney to go along with the no-incarceration recommendation. One of the stipulated hearing exhibits (Exhibit F) is a recorded conversation in which Respondent tells the mother, "The agreement would have to be that the DA goes along with this. So it would be you and the DA agreeing to recommend a suspended sentence. If the DA won't do that, then it's really worthless for [Respondent's client] to even try to do this, okay?" Respondent did no research. Respondent knew that he could not offer money to the victim's family as that would be a clear ethical violation.

9. The victim's parents declined Respondent's offer, submitted victim impact statements recommending a lengthy prison sentence for their daughter's molester, and appeared and testified at the sentencing hearing. Judge Michael K. Davis sentenced Respondent's client to 12 to 22 years in prison consistent with the written

plea agreement, and ordered Respondent's client to pay past restitution in the amount of $12,738.00 to Aetna Insurance for counseling expenses paid by the family's health insurance, and $4,864.00 to the Wyoming Division of Victim Services for the uninsured portion of such counseling expenses. *See* Exhibit L.

10. It turned out that Respondent's client received nothing from the $250,000 personal injury award, most of which went to pay attorney's fees and costs, with the balance (approximately $58,000) being interpleaded into court for the benefit of the judgment creditors of Respondent's client. Donald J. Sullivan, one of the attorneys for Respondent's client in the personal injury action, testified that Respondent never called him to discuss the award or ask how much of the proceeds Respondent's client would be receiving.

11. The Wyoming State Bar contends that Respondent was fully aware that he was offering the victim's mother a monetary inducement to discourage her from providing relevant information to the sentencing judge (i.e., her honest recommendation for incarceration as the appropriate disposition of the criminal case in which her young daughter was the victim of sexual abuse at the hands of her uncle; *see* W.S. § 7–21–102(c)(iv)) and to substitute the recommendation desired by Respondent's client (i.e., probation, not prison). The Wyoming State Bar contends that Respondent violated Rules 3.4(f), 4.1(a) and 8.4(d) of the Wyoming Rules of Professional Conduct.

12. The hearing in this matter proceeded in two phases. In the first hearing, held May 11, 2012, the Board received evidence regarding whether a violation of the Rules of Professional Conduct occurred. As set forth below, it was the conclusion of the Board following the first hearing that Respondent violated Rule 8.4(d). No violation was found by clear and convincing evidence with respect to Rule 3.4(f) or Rule 4.1(a). The case proceeded to the second phase, held July 11, 2012, at which evidence was received regarding aggravating and mitigating circumstances in order to determine appropriate

discipline. *See* Section 19(c) of the Disciplinary Code for the Wyoming State Bar.

13. In the first hearing, the sister of Respondent's client (who was the mother of the sexual abuse victim) testified to the following:

a. In May of 2006, Respondent's client, who was living in California at the time, came to visit his sister's family in Cheyenne. The family consisted of Respondent's client's sister, her husband, and the couple's 6–year–old daughter and 4–year–old son.

b. On the third day of his visit to Cheyenne, Respondent's client was seriously injured in a motorcycle accident.

c. Following a lengthy hospitalization, Respondent's client stayed in Cheyenne to recuperate. He lived first with his sister and her family for a short time before moving to a more wheelchair-friendly mobile home that the family rented for Respondent's client near their residence.

d. Respondent's client remained in the rented mobile home for more than two years. During that time, he spent significant time alone with his young niece and nephew.

e. During 2008, the brother-in-law of Respondent's client sustained a serious injury of his own. As a result of that event, the family incurred significant medical bills, lost their business, and filed bankruptcy. They lost their home and moved into the mobile home they had rented for Respondent's client. Respondent's client returned to California.

f. Respondent's client returned to Wyoming briefly in the spring of 2009, when his personal injury lawsuit against the sheriff's deputy who allegedly caused his motorcycle accident went to trial in Casper, Wyoming.

g. In the fall of 2009, the sexual abuse victim reported what her uncle had done to her to law enforcement authorities. The sheriff's detective assigned to investigate the case arranged for a recorded telephone call from the victim's mother to her brother. During that telephone conversation, Respondent's client admitted that he had given his young niece "a sex lesson in 101," that he had photographed her posing "like

the Playboy models," and had watched pornographic videos with her.

h. As a result of the admissions he made during that telephone conversation, Respondent's client was charged with seven felonies. He was arrested and brought to Wyoming in February of 2010.

i. As the criminal case against her brother proceeded, the sister of Respondent's client and her daughter, the sexual abuse victim, underwent intensive counseling to cope with the emotional damage both had suffered. The cost of the counseling was paid in part by the family's health insurance, with the uninsured portion being paid by Victim Services.

j. During the criminal prosecution of Respondent's client, the victim's mother had regular contact with the Victim/Witness Coordinator at the District Attorney's office. She learned through that source that in March of 2011, shortly before the criminal trial, Respondent's client had entered into a plea agreement. *See* Exhibit A. The victim's parents objected to the plea agreement, but it had already been signed.

k. A couple weeks after the plea agreement, Respondent's client received a $250,000 award in his personal injury lawsuit. *See* Exhibit B.

l. On April 13, 2011, Respondent called the victim's mother and told her that his client "was willing to offer us a substantial amount of money to not turn in our victim impact statements and to plea to the DA that we request that he serve no jail time, probation only." Respondent told the victim's mother that his client was willing to pay $15,000. The initial telephone conversation was overheard by the manager of the hair salon where the victim's mother was employed. The victim's mother ended the conversation by saying, "Let me get my thoughts straight, and I will call you back."

m. After she received the telephone call from Respondent, the victim's mother called the District Attorney's office, "Because I just knew this wasn't appropriate or right, or could he really offer money to try and buy his way out of jail, so I called the DA's office."

n. The District Attorney's office arranged for the victim's mother to meet with a detective from the Sheriff's office, who interviewed the victim's mother the following day (Exhibit F). The victim's mother also provided a written statement (Exhibit D).

o. Respondent called the victim's mother again two days after the first call on April 15, 2011. The ensuing telephone conversation was recorded by the Sheriff's detective (Exhibit F (audio recording); Exhibit G (transcript)). Though not all of the statements made by the victim's mother can be heard on the audio recording, Respondent can be heard making the following statements:

Respondent: What's required of you? Well, basically it would—it would be probably have me and you going to [the District Attorney] and saying that you would recommend to the judge a—that he be put on probation and have a lengthy probationary term rather than incarceration.

Victim's mother: [Inaudible]

Respondent: Yeah, you certainly can. But we would want you to recommend no prison time. And I mean, you can certainly tell the judge how it's affected you and your daughter and all that and the effect on the family. So we wouldn't ask you not to do that. It would just be at the end, you know, we would ask you to recommend a nonprison sentence.

Victim's mother: [Inaudible]

Respondent: We'll have to figure that out. This money has been ordered by the court, and so I'll have to find out exactly when the check is coming, but what we would probably do is postpone the sentencing until we're able to get everything materialized financially.

Victim's mother: [Inaudible]

Respondent: Yeah, we would have—I would have a check, a certified check to you, you know, waiting, you know waiting until the sentence. Then once he is sentenced, we would give that check to you, or before.

Victim's mother: [Inaudible]

Respondent: Yeah, it's kind of complicated how it would work, but we would—if we got you and the DA, and the judge could do whatever he wants, but the agreement would be basically, you know, for you and the DA that— that you and the DA recommend nonprison sentence, and that would fulfill your end of the bargain, and you would get the payment no matter what, even if the judge sends him to prison.

Victim's mother: [Inaudible]

Respondent: Or—I mean, or we could work something out with the DA where it's—anyway, it would—where the judge would know that this was the new deal that we had struck, and we would get that worked out. But yeah, once you did your part, you know, that's what you got before—in exchange for that, then you would be, you know, paid the money as long as you held up your end of the bargain.

Victim's mother: [Inaudible]

Respondent: Well, it was kind of hard to come up with a figure, but basically what I advised him is, you know, for the next, you know 10 or 15 years I would say, you know, we tried to come up with a number where you could get adequate counseling and restitution, so we tried to—come up with that number trying to figure how much it might cost for the next 10 or 15 years for counseling.

Victim's mother: [Inaudible]

Respondent: [Inaudible] So, yeah, you know, it's not a direct, you know, scientific number, but something that we came up with, and so if that's something you're willing to do, that's what I would just—you know, that's what he's requesting, so . . .

Victim's mother: [Inaudible]

Respondent: Okay. Yeah, call me back. I have to run out myself, so yeah, just call me back and, you know, there's certain details that we need to discuss if you're willing to do it, and we'll talk more about it.

p. At the suggestion of the Sheriff's detective, the victim's mother scheduled a meeting with Respondent at Respondent's office. That meeting took place on April 21, 2011. In advance of the meeting, law enforcement fitted the victim's mother with a wireless microphone. The recording of that meeting (Exhibit F (audio recording); Exhibit G (transcript)), includes the following exchanges between Respondent and the victim's mother:

> Respondent: All right. Don't worry, I'm not gonna do anything that you're not willing to do. So basically it's this. [Inaudible] this money settlement and basically [inaudible] that he was in, and so he has some money, and with that what we're requesting is that you recommend to the DA's office and to the Court that his sentence be suspended, be put on probation. If you're willing to do that—and he understands that even if you do do that, the judge may not agree with it, and the DA may not, but the agreement would have to be that the DA goes along with this. So it would be you and the DA agreeing to recommend a suspended sentence.
>
> If the DA won't do that, then, you know, then it's really worthless for him to even try to do this, okay? So 'cause the judge will give him a prison sentence no question if the DA recommends it, because that's what the agreement for if his—but if the DA says, for instance, okay, we've talked with you, we agree that we'll recommend a suspended sentence in lieu of the, you know, financial payment of restitution for future restitution and stuff, and they say that, you know, we think that's important and will help your daughter and stuff, then that—you know, then regardless of what the Court does, that would be the agreement, and he would pay you that money, and that's all he's asking for. So . . .
>
> Victim's mother: Okay. What do we put on our impact statements? * * *
>
> Respondent: Yeah. I mean, you can put whatever you want. You know, ultimately this—I mean, you can describe all those things on how it's affected you

and the family and, you know, all that kind of stuff, and we're not asking you to, you know, alter that in any way, just that your recommendation would be changed by this promise to, you know, pay for future counseling and rehabilitation or, you know, restitution. So—so that's the only thing that he'd be asking for is that the recommendation be a suspended sentence * * *

Victim's mother: Okay. * * * When would we get the money? I mean ...

Respondent: He—he has the money. I think the check has been written to him, so it'll be in an account. I will get a certified check to you before the sentencing, so you'll have it so you'll know, and—but we got to talk to the DA first. * * * [A]s far as I know, you know, the check's gonna be written to him, and it's gonna be deposited into an account. I'll have him issue me a check, just a certified check in your name. So we'll make sure that that's all done, no questions about it [inaudible]. We'll actually get you the check.

Victim's mother: Before sentencing, okay, because that was the other thing is can we get it in writing or ...

Respondent: Mm-hmm. Yeah, it'll be in writing. We can draw up an agreement in writing just to reflect that, you know, this is what you're gonna receive in exchange for a recommendation. But like I said, we need to talk to the DA first, you and I or you. If you want me to be there, I certainly will, but we need to talk to the DA and explain this to them and see if they're gonna go along with it, so we'll need to do that, if you're willing to do this.

And it'll be—like I said, it'll be—we need to get the DA to agree to it. If we can't then it's not gonna help him in any way, so you know, then the deal is kind of off the table.

Victim's mother: Okay. Oh, I got to explain this to my husband.

Respondent: Yeah.

Victim's mother: You know, because we could wimp out on our statements and ask for probation, and then the DA think, well, no way. We'll we've kind of just sent in [inaudible].

Respondent: Yeah, and I can—I mean, that's why we need to talk to the DA. What I need to know is, I guess, if you're willing to do this. If you are, then let's—I'll get the DA on the phone as soon as possible and explain this to them, and then they'll obviously want to speak to you. So we can either do that together or you can go in and speak with them, tell them you've talked about this to me, and this is where you're at, and you either want them to go along with it or not. So however you want to do that. But just so that—just so I know—you know, I haven't approached them yet because I wanted to speak with you first to see if it's even something you would entertain. So ...

Victim's mother: My thing is our families.

Respondent: I understand. These are tough things, and you know, there's a lot of issues that go into it. You want him punished. On the other hand, you know, from my perspective at least, you know, I've been doing this awhile, and you know, I think the main thing is to get her help and treatment in the future is going to be very beneficial if you have * * * the money to do that * * *

Victim's mother: I totaled up our claims, though, and they were so far $12,600 in a year and a month.

Respondent: Okay. Well, he's—see, the thing is is he's probably gonna be responsible for that. * * * So this is in addition to that.

Victim's mother: Okay.

Respondent: So, yeah, it would be for future expenses. He's probably gonna be—as long as you submit those as far as restitution, he's gonna be required to pay that anyway. So ...

Victim's mother: Oh. I didn't know that.

Respondent: That will come—I mean, he'll make payments towards that restitution, but he'll—the lump sum will be

for future restitution for your daughter. So . . .

Victim's mother: * * * and he's already gotten the check?

Respondent: Mm-hmm.

Victim's mother: So we could get the money just as soon as the DA says he would agree with the agreement:

Respondent: Yeah. As long as the DA agrees to it, then that's—you're holding up your end of the bargain. I mean, the bargain is only that you recommend it and the DA recommend a suspended sentence. If we go in there and you guys do that and the judge still imposes a prison sentence, which he could do, you've held up your end of the bargain, so you get the payment. * * * So regardless of what happens at sentencing, the only—the only, you know, contingency is that you recommend it and the DA recommends it. * * * And that's the best that you can do * * *

You know, and then it will be up to me to, you know, try and convince the judge to go along with it, which is a huge uphill battle. * * * I know the judge is not gonna be thrilled with going along with that agreement, but he might, so . . . * * * So talk with your husband. Let me know, and then, like I said, once you let me know yea or nay on this, then I will contact the DA's office, and then I'll tell 'em what's going on, and you can talk to 'em. I mean they'll want to talk to you personally * * * to make sure that it's, you know, it's—that you're voluntarily doing this.

Victim's mother: Right. * * *

Respondent: You will call me today or tomorrow?

Victim's mother: Yeah. * * *

q. The victim's mother and her husband never considered accepting the offered $15,000 payment in exchange for a no-incarceration recommendation for Respondent's client. When asked why not, the victim's mother testified, "Because what respect for us would our little girl have? My husband and I both were en-raged—for her to finally come forward and to not live in fear, and she wanted to help other little girls, but we are going to say no for $15,000 so you can have counseling? We can't provide that for her, so we decided to let him out? Our daughter is so happy. This last year she has grown so much and has had her self-confidence back because she knows he is locked up. Now, what would it have done to her future if he was on the streets?"

r. The day after the meeting with Respondent, the victim's parents submitted their victim impact statements (Exhibit J). In her statement, the victim's mother urged the Court to give Respondent's client the maximum sentence, "so he can't hurt anyone else." In his statement, the victim's father urged the Court to give Respondent's client "the maximum sentence under the law."

s. The victim's parents appeared and testified at the May 26, 2011, sentencing hearing. *See* Exhibit K.

t. The victim and the victim's mother continued in counseling from September 2009 until September 2011, when the two-year financial assistance provided by Victim Services ran out. The victim's mother, who had been diagnosed with Post–Traumatic Stress Disorder, continued in counseling until December 2011.

14. The District Attorney testified to the following:

a. The District Attorney had substantial experience prosecuting cases involving child sexual abuse. He was the prosecutor on the case involving Respondent's client.

b. The District Attorney negotiated and signed the plea agreement in Respondent's client's case. *See* Exhibit A. After the plea agreement was filed with the Court on March 11, 2011, the parties waited for the presentence report ("PSR") to be completed by Probation and Parole.

c. The District Attorney's next involvement in the case came when he received a call from the Victim Witness Coordinator, who came to the District Attorney with a concern about a telephone call the victim's mother had received from Respondent. Reportedly, the victim's mother had been

offered money "in order to try and get [the victim's mother] to argue for probation in the case."

d. The District Attorney testified that he "didn't really believe" the report, which "seemed very not just out of character for [Respondent] but for any defense attorney, but it seemed to me like it could possibly be a criminal matter. I didn't believe it at first, so I wanted some proof or information before I took any steps."

e. The District Attorney later listened to the recording of the April 15, 2011, telephone conversation between Respondent and the victim's mother, which confirmed the earlier report. The District Attorney decided to assign the case to a district attorney outside of his district because of his long-time acquaintance with Respondent, whom he considered to be a colleague, and because the case related to a criminal matter already being handled by the District Attorney.

f. The District Attorney also testified regarding an April 22, 2011, email he received from the Victim/Witness Coordinator, in which she reported being told by Respondent that he needed her "to twist a victim's arm for him." The District Attorney told the Victim/Witness Coordinator to report the matter to the Sheriffs detective who was investigating Respondent's contacts with the victim's mother.

g. The District Attorney testified that the restitution statutes require future restitution payments to be set forth by Probation and Parole in the PSR "so the judge has that in the presentence report and he can order a certain amount of monthly payments." The District Attorney explained:

> I want to be clear that future restitution is different than restitution. Restitution is usually something that's owed at the time. Future restitution, according to the statute, is for future medical care that might be necessary, and that's why the statutes require that the Probation and Parole officer really get that figured out ahead of time so they can say, "They are going to be going to counseling once

a week for the next four years," figure out how much that is going to cost per session, get it all figured out so the judge can then order a specific amount per month.

h. The District Attorney has not encountered a situation in which a criminal defendant offered future restitution as part of a plea negotiation in a sexual abuse case. The District Attorney testified, "If future restitution is something the defense attorney wanted to use in the bargaining process, then, yes, I would expect them to work through my office, and then we could work with Probation and Parole to figure out what the future restitution needs to be."

i. The following hypothetical was posed to the District Attorney: If the victim's mother had come to him and said Respondent was offering $15,000 in future restitution so the family could get some help for the victim in the future, but they will not get the money unless the District Attorney changes his recommendation and go along with the probation recommendation, what would his response have been? His answer:

> Probably, yes, with certainty I would have told her my obligation. I do have some obligation to victims, but my obligation in general is to the community, as well as making sure that proper punishment is meted out. This is an individual that had, I believe, three prior felonies. This was a very serious case. As far as I was concerned, 12 years to 22 years in prison was a gift, and I would have told her absolutely not.

15. The Victim/Witness Coordinator assigned to the underlying criminal case testified via deposition (Exhibit H). She started with Probation and Parole in 1999 and has occupied the position of Victim/Witness Coordinator for five years. Her job duties include working with families and victims of crimes, working closely with the District Attorney's office, accompanying victims to court, helping them with their victim impact statements, and maintaining contact with victims to explain how the system works and how their case is progressing. With respect

to the underlying sexual abuse case, the Victim/Witness Coordinator testified:

a. The Victim/Witness Coordinator met with the victim and her mother when the case was initially charged. The mother brought her daughter to the office. The victim's mother had questions about bond and the court process. The Victim/Witness Coordinator made sure the family would receive crime victims' compensation.

b. The Victim/Witness Coordinator had known Respondent for several years, and was aware that Respondent was the public defender for the defendant in this case.

c. The Victim/Witness Coordinator was aware that a plea agreement had been signed in this case. The Victim/Witness Coordinator was aware that the victim's mother wanted the defendant to go to prison.

d. After the plea agreement but prior to sentencing, the Victim/Witness Coordinator received a telephone call from the victim's mother, who told her Respondent had called her at work and offered a substantial amount of money if she would ask that Respondent's client be placed on probation rather than being sent to prison. In the words of the Victim/Witness Coordinator, "It was the first time that anything like that had happened in my career that I knew of, and I was not really sure what to do, so I told her that I had to speak to my boss. . . ."

e. The Victim/Witness Coordinator called the District Attorney and reported the call she had received from the victim's mother. The District Attorney instructed her to report the matter to one of the detectives with the Sheriff's office.

f. On the morning of April 22, 2011, Respondent approached the Victim/Witness Coordinator outside one of the district courtrooms. Respondent told Victim/Witness Coordinator, "I need you to twist a victim's arm for me." When the Victim/Witness Coordinator asked Respondent what he was talking about, Respondent said, "You need to tell [the victim's mother] that she should argue for probation." The Victim/Witness Coordinator

asked, "Isn't there already a plea agreement in place?" Respondent answered, "Yeah, but things change."

g. The Victim/Witness Coordinator was shocked by Respondent's statements to her. She terminated the conversation immediately.

h. The Victim/Witness Coordinator was shocked by Respondent's approach. When asked if Respondent appeared to be joking, the Victim/Witness Coordinator testified, "I knew he wasn't joking, so I—I mean, because I knew that he had called [the victim's mother], and I knew that that was—and part of the reason why I guess that I—I was uncomfortable about it is because I knew that I had told my boss and it was being taken very seriously, and so I—I didn't want to have anything to do with it any further."

i. The Victim/Witness Coordinator went to her office immediately and sent the District Attorney an email documenting the exchange with Respondent. *See* Exhibit 1 to Exhibit H.

16. Cheyenne attorney Donald J. Sullivan, one of the lawyers for Respondent's client in the personal injury action, testified via deposition (Exhibit I). Mr. Sullivan testified that Respondent's client was injured in a motorcycle accident on May 18, 2006, and that Mr. Sullivan and his co-counsel, attorney Robert Reese of Green River, represented Respondent's client in a personal injury action in federal court against the deputy sheriff involved in the collision with Respondent's client. The case was tried to United States District Judge William F. Downes in late April and early May, 2009. With respect to Judge Downes' award, Mr. Sullivan testified as follows:

a. It took nearly two years for Judge Downes to issue his decision awarding $250,000 to Respondent's client Mr. Sullivan received the decision (Exhibit B) on April 1, 2011. He immediately delivered a copy of the decision to Respondent's client, who was in jail in Cheyenne pending resolution of the sexual abuse charges against him.

b. On April 15, 2011, Mr. Sullivan received a check for the $250,000 judgment

from the Wyoming Attorney General's office. He immediately deposited the check into his lawyer's trust account.

c. Mr. Sullivan calculated the contingent fee and costs advanced on the case pursuant to the written fee agreement with Respondent's client, which together totaled approximately $192,000, leaving approximately $58,000 after payment of fees and costs.

d. As he prepared to disburse the net proceeds of the judgment to Respondent's client, Mr. Sullivan learned that Respondent's client had other, substantial obligations of which Mr. Sullivan had previously been unaware. There had been several garnishments served upon Respondent's client as the result of collection actions against him that had been taken to judgment. There was a back child support obligation in the State of Texas. According to Mr. Sullivan's testimony, "The upshot of all that was that I felt I was aware of a pretty substantial number of financial obligations either owing or potentially owing by [Respondent's client], and I felt that I needed to proceed very carefully with disposing of the remaining funds."

e. On May 10, 2011, Mr. Sullivan filed a Motion in Interpleader in state district court and paid the net proceeds of the personal injury judgment in the amount of $58,328.86 into court. *See* Exhibit 2 to Exhibit I.

f. Mr. Sullivan was told by the deputy sheriff who served a copy of the Motion in Interpleader upon Respondent's client in jail that Respondent's client "became enraged and told the sheriffs [sic] that he wanted to file criminal charges against me for embezzlement."

g. On May 25, 2011, the state district judge entered an order holding that Mr. Sullivan had fully and properly discharged his obligations to Respondent's client with respect to distribution of the net proceeds of the personal injury award and discharging Mr. Sullivan from any further responsibility with respect to said proceeds. *See* Exhibit 3 to Exhibit I. Mr. Sullivan does not know what the judge did with the money Mr. Sullivan paid into court in the interpleader action.

h. Mr. Sullivan did not recall having any communication with Respondent regarding the personal injury award, and did not document any such communication in 257 typed pages of notes Mr. Sullivan kept regarding his work on the case.

17. Pertinent to this Board's findings, conclusions and recommendation, Respondent testified to the following:

a. Respondent has practiced law for 19 years, including 17 years as a public defender.

b. Respondent admits that during his initial telephone call to the victim's mother, he mentioned $15,000 as the amount of the proposed payment.

c. Respondent was terminated by the Public Defender's office on May 15, 2011, for his conduct that is the subject of this disciplinary proceeding.

d. After he was terminated by the Public Defender's office, Respondent charged his client $2,500 to represent him at the May 26, 2011, sentencing hearing.

e. Respondent does not recall making the "twist a victim's arm" statement to the Victim/Witness Coordinator. If he said it, he was joking.

f. When he was first asked if he ever asked attorney Sullivan how much money was available, Respondent said he spoke with Mr. Sullivan "probably after the [May 26, 2011] sentencing, so it was later down the road." When asked if he learned at some point that his client would not be getting any money, Respondent testified, "I believe it was after all this happened and I was fired at the Public Defender's office [May 15, 2011]. I don't know if it was before [the May 26, 2011] sentencing or after that, but I—what I did was I called his attorney, Don Sullivan, and I asked him about it, and he said, 'He's not getting a dime.'" Then, when confronted with Bar Counsel's argument at the July 11, 2012, sanction hearing, that Respondent's conduct in charging $2,500 to represent his client at the May 26, 2011, sentencing hearing was evidence that he was acting with a selfish motive (an aggrava-

ting factor under the ABA sanction guidelines), Respondent testified that he was aware that his client would not be getting any money as a result of a conversation Respondent and his client had before Respondent was fired by the Public Defender's office, and that Respondent knew he was never going to get paid the $2,500.

g. In making the $15,000 offer of "future restitution" to the victim's mother, Respondent was unaware (1) what the expenses had been at that point for one and a half years of counseling the victim and her mother had undergone; (2) that those expenses had been paid by the family's health insurance and by the State Victim Assistance Fund; (3) whether continuing benefits were available through the family's private insurer; (4) how many times the victim or her mother had seen a counselor; (5) what the expense associated with those visits was; (6) what the treatment plan for the victim and her mother was; and (7) whether the treatment plan required the victim and her mother to continue in counseling for more than three months after the sentencing.

h. Respondent was aware that future restitution can be the subject of an agreement between the parties if the amount is reasonable and testified that it was his purpose and intent to seek such an agreement as part of a more favorable recommendation from the District Attorney. Respondent denies that he was asking the victim's mother to change her recommendation regarding sentencing of Respondent's client. Respondent says the only thing he was asking the victim's mother to do is consider a different recommendation. Respondent "probably didn't know" that Wyoming's future restitution statute, W.S. § 7–9–114, requires that future payments for a victim's long-term physical care be ordered by the Court in a fixed monthly amount.

i. Respondent admitted that the Public Defender's office filed an *Anders* brief as part of the client's criminal appeal which included discussion of Respondent's communications with the victim's mother. In

that brief, which was filed with the Wyoming Supreme Court on March 5, 2012, and is a matter of public record, the client's appellate counsel states, "In consultation with appellate counsel, [Respondent's client] believed he received ineffective assistance of counsel because of the allegations that his trial counsel, [Respondent], improperly proposed to give money to the victim's family in exchange for their cooperation in providing any victim statement at the Sentencing Hearing." Exhibit M., p. 9. However, the *Anders* brief concludes that despite the allegation that Respondent improperly proposed to give money to the victim's family and that this amounts to ineffective assistance of counsel, the Plea Agreement was nevertheless accepted as presented to the District Court. *Id.* at 11. Thus, even if the alleged conduct of Respondent was true and amounted to ineffective assistance of counsel, it did not prejudice Respondent's client and was harmless error. *Id.*

j. This case is the first occasion on which Respondent has made a monetary offer to a sexual abuse victim or the victim's family in return for changing a sentencing recommendation.

k. Before presenting the offer to the victim's mother, Respondent did not consult with any of his colleagues about the propriety of the offer. He did no legal research regarding future restitution.

l. Respondent recognized that his conduct relevant to Rule 8.4(d) gave rise to the appearance of impropriety and that consequently, many criminal defense lawyers would have done things differently to avoid such appearances. Respondent believed his conduct was within the restitution procedures recognized by Wyoming law. Respondent readily admitted salient facts concerning his failure to first obtain the factual support for the figure he proposed as an estimate for the future restitution.

18. The expert witness for the Wyoming State Bar was a former Wyoming Attorney General with more than twenty years' experience in criminal law, including substantial experience prosecuting and negotiating plea

agreements in cases of felony sexual abuse. The expert offered the following opinions with respect to Respondent's conduct in the instant matter:

a. Respondent had no factual basis for characterizing the proposed $15,000 payment as being for "future restitution." There is no evidence that anyone talked to a counselor who was seeing the victim to find out how frequently she was going to need continuing counseling, or what type of counseling would be required in the future. The expert opined, "It's a dollar figure pulled out of the air with no basis of support whatsoever."

b. Proper functioning of the criminal justice system depends upon good, honest, ethical prosecutors and defense lawyers, and witnesses who understand that serious, important things are going to happen based on their testimony. Witnesses must be able to truthfully and accurately relay information to the fact finder, be that the jury or the judge. In the words of the expert,

If any one part of that breaks down, the criminal justice system breaks down. You know, so if one can purchase favorable testimony, you know, for some sum that has nothing to do with restitution, it's just an amount of money that causes that witness to bite and agree to change their testimony or change their recommendation to the District Attorney's office, I believe the whole system fails because then the judge is basing his decision on an important matter like sentencing not on what the victim truly believes or what the facts truly are but, you know, what that testimony is as influenced by the payment of some sum of money.

c. Even though witnesses who testify at a sentencing hearing are not typically under oath, the Court relies upon witnesses or victims to provide reliable and accurate recommendations in their victim impact statements.

19. Respondent's expert, a renowned University of Wyoming professor in ethics, testified that the phrase "prejudicial to the administration of justice" was general and vague and would necessarily have to obtain its meaning and application from the customs and practices of criminal defense lawyers and the courts. He testified that ultimately the phrase would find its meaning by what the Supreme Court might say it means. Respondent's expert opined that where the experts disagreed as to the propriety of the conduct, he did not believe it fair to sanction a lawyer.

20. Respondent also had several Wyoming criminal defense attorneys testify as to their custom and practice with restitution in the criminal justice arena. They each testified that there is no directly applicable precedent, and the Board's decision appears to be the first word on the issue. None of these witnesses testified that they had ever made an offer of money directly to a victim of sexual assault or a victim's family for future restitution or for any reason on behalf of their criminal defendant that pled guilty for a favorable sentencing recommendation.

21. The sentencing judge in the Respondent's case testified that when he sentenced Respondent's client he was aware of the allegations concerning Respondent's offer of money to the victim's family. The judge testified that he did not consider the allegations in the sentencing and would have a made a finding to that effect had he been requested to do so.

22. The foregoing testimony and exhibits are sufficient to prove, by clear and convincing evidence, Respondent's violation of Rule 8.4(d), which provides, "It is professional misconduct for a lawyer to ... engage in conduct that is detrimental to the administration of justice." The evidence does not prove, in a clear and convincing manner, that Respondent violated Rule 3.4(f) or 4.1(a).

23. In considering the appropriate sanction, the Board relies upon the following factual findings:

a. Respondent breached numerous duties he owed to the legal system when he presented a monetary inducement to the victim's mother as a "quid pro quo" to persuade her to change her sentencing recommendation. Respondent couched the offer as "fu-

ture restitution," but made no good faith effort to calculate the amount reasonably required for future counseling, nor did he attempt to comply with the statutory requirements for an award of future restitution.

b. Respondent's mental state evinced a willful disregard of his duties to the administration of justice. Respondent told the Victim/Witness Coordinator that he needed her help to "twist a victim's arm" to change a sentencing recommendation. Respondent knew that he was attempting to influence a witness to give some other than an honest sentencing recommendation. Respondent, believing that his client was coming into some money, attempted to benefit by charging the client $2,500 to appear at the sentencing hearing after Respondent's discharge from the Public Defender's office.

c. Respondent's conduct resulted in both real and potential injury to the public, the legal system and the profession. In his efforts to persuade the victim's mother to go along with the deal, Respondent told her that Respondent's client would likely be ordered to pay "past restitution," but said nothing about the availability of "future restitution" under the applicable statute. As a result of having committed acts that were by their nature prejudicial to the administration of justice, which acts are now forever commemorated in the *Anders* brief filed by the client's appellate counsel and confirmed by this disciplinary proceeding, Respondent put himself and the criminal process in a terrible light.

d. The following aggravating factors are present: (1) vulnerability of the victim; and (2) substantial experience in the practice of law.

e. The following mitigating factors are present: (1) absence of a prior disciplinary record; and (2) character and reputation. The parties agree that Respondent does not have any prior disciplinary record. He has not been disciplined or sanctioned. Respondent presented several witnesses to his good character and reputation, pursuant to Standard 9.32(g). Respondent enjoys a reputation as a hard-working conscientious lawyer dedicated to his clients and committed to ethical practices. He has been a mentor to other lawyers and plays an important and valued role in defending persons accused of criminal conduct. The witnesses described Respondent as a capable and skilled lawyer who works very hard and achieves excellent results for his clients. Respondent was described as an honest person who would not have engaged in the conduct had he understood his conduct to violate the Rules of Professional Conduct.

24. Through Bar Counsel, the Wyoming State Bar argued that a suspension is warranted. Respondent argued for a private reprimand. In the opinion of the Board, a public censure is the appropriate discipline for Respondent.

### Conclusions of Law

25. "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." Preamble to the Rules of Professional Conduct, comment 1. The Rules of Professional Conduct "do not ... exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules. The Rules simply provide a framework for the ethical practice of law." *Id.*, comment 15.

26. "The license to practice law in this state is a continuing proclamation by the [Wyoming Supreme] Court that the holder is fit to be entrusted with professional, legal, and judicial matters and to aid in the administration of justice as an attorney and as an officer of the Court." Disciplinary Code for the Wyoming State Bar, § 2(a). An attorney is expected to act "fairly, honestly, reasonably and with unquestionable integrity in all matters in which he or she acts as an attorney at law." Rule 401, Rules and Procedures Governing Admission to the Practice of Law.

27. Under Rule 3.4(f), a lawyer shall not "request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (1) the lawyer is a relative or an employee or other

agent of a client; and (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information." Comment 1 to Rule 3.4 states, "The procedure of the adversary system contemplates that the evidence in the case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like."

■ 28. Similarly, there are criminal statutes that prohibit anyone, including a lawyer, from soliciting others to engage in unlawful acts which threaten the integrity of the justice system, including subornation of perjury and obstruction of justice. *See, e.g.,* W.S. §§ 6–5–301(a) (perjury) and 6–5–305(a) (influencing a witness). As demonstrated in the comments cited above, a lawyer has a heightened duty when issues arise in which the administration of justice is implicated.

29. Rule 4.1(a) provides that a lawyer is prohibited from knowingly making a false statement of material fact to a third person.

30. Rule 8.4(d) prohibits a lawyer from engaging in conduct prejudicial to the administration of justice. For a similar case involving a violation of this rule which resulted in a lawyer's suspension, *see Florida Bar v. Machin,* 635 So.2d 938 (Fla.1994).

31. By statute, a victim impact statement "may include but shall not be limited to" the following:

An explanation of the nature and extent of any physical, psychological or emotional harm or trauma suffered by the victim;

An explanation of the extent of any economic loss or property damage suffered by the victim;

The need for and extent of restitution and whether the victim has applied for or received compensation for loss or damage; and

The victim's recommendation for an appropriate disposition.
*See* W.S. § 7–21–102(c).

32. With respect to "future restitution," Wyoming law specifically provides for monthly payments for future health care (including mental health care) where such care is reasonably probable to be required for more than three months. *See* W.S. § 7–9–113. In such cases, the sentencing judge is required to "fix a monthly amount to be paid by the defendant for as long as long-term physical health care of the victim is required as a result of the crime." *See* W.S. § 7–9–114(b).

33. The American Bar Association's "Standards for Imposing Lawyer Discipline" (hereafter referred to as the "ABA Standards") state, "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession." ABA Standard 3.0 lists the factors to be considered in imposing a sanction after a finding of lawyer misconduct:

(a) the duty violated;

(b) the lawyer's mental state;

(c) the potential or actual injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

34. Respondent's misconduct falls within the heading "Violation of Duties Owed to the Legal System," which the ABA Standards subcategorize as "False Statements, Fraud, and Misrepresentation" (Standard 6.1), "Abuse of the Legal Process" (Standard 6.2), and "Improper Communications with Individuals in the Legal System" (Standard 6.3):

6.1 False Statements, Fraud, and Misrepresentation

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:

6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

6.13 Reprimand [i.e., "public censure" under Section 4(a)(iii) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer is negligent either in determining whether the statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal system, or causes an adverse or potentially adverse effect on the legal proceeding.

6.14 Admonition [i.e., "private reprimand" under Section 4(b) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer engages in an isolated instance of neglect in determining whether the submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or causes little or no adverse or potentially adverse effect on the legal proceeding.

6.2 Abuse of the Legal Process

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of the tribunal except for an open refusal based on an assertion that no valid obligation exists:

6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or a rule with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.

6.23 Reprimand [i.e., "public censure" under Section 4(a)(iii) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.

6.24 Admonition [i.e., "private reprimand" under Section 4(b) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.

6.3 Improper Communications with Individuals in the Legal System

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving attempts to influence a judge, juror, prospective juror or other official by means prohibited by law:

6.31 Disbarment is generally appropriate when a lawyer:

(a) intentionally tampers with a witness or causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceedings; or

(b) makes an ex parte communication with a judge or juror with intent to affect the outcome of the proceeding, and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding; or (c) improperly communicates with someone in the legal system other than a witness, judge or juror with the intent to influence or affect the outcome of the proceeding, and causes significant or potentially significant interference with the outcome of the legal proceeding.

6.32 Suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding.

6.33 Reprimand [i.e., "public censure" under Section 4(a)(iii) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer is negligent in determining whether it is proper to engage in communication with an individual in the legal system, and causes injury or potential injury to a party or interference or potential interference with the outcome of the legal proceeding.

6.34 Admonition [i.e., "private reprimand" under Section 4(b) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer engages in an isolated instance of negligence in improperly communicating with an individual in the legal system, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with the outcome of the legal proceeding.

35. The comments to the foregoing standards are instructive. The commentary to Section 6.12 states, "Suspension is appropriate when a lawyer has not acted with intent to deceive the court, but when he knows that material information is being withheld and does not inform the court, with the result that there is injury or potential injury to a party, or an adverse or potentially adverse effect on the legal proceeding."

36. Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

37. ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:

9.1 Generally

After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.

9.2 Aggravation

9.21 *Definition,* Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.

9.22 Factors which may be considered in aggravation. Aggravating factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of the victim;

(i) substantial experience in the practice of law;

(j) indifference in making restitution; and

(k) illegal conduct, including that involving the use of controlled substances.

9.3 Mitigation.

9.31 *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32 Factors which may be considered in mitigation. Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(2) the chemical dependency or mental disability caused the misconduct;

(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

(*l* ) remorse; and

(m) remoteness of prior offenses.

9.4 Factors Which Are Neither Aggravating nor Mitigating.

The following factors should not be considered as either aggravating nor mitigating:

(a) forced or compelled restitution;

(b) agreeing to the client's demand for certain improper behavior or result;

(c) withdrawal of complaint against the lawyer;

(d) resignation prior to completion of disciplinary proceedings;

(e) complainant's recommendation as to sanction; and

(f) failure of injured client to complain.

38. In a case with important similarities to the instant matter, the Florida Supreme Court discussed the dangers associated with using financial inducements to influence a witness's presentation to the Court:

> [T]he fair and proper administration of justice requires that the rich and the poor receive equal treatment before the court. A wealthy defendant cannot be allowed to buy silence and thereby gain a chance at a lesser sentence than that received by one unable to pay for silence. This is so because when "justice" can be bought by the highest bidder, there is no justice. An attorney's involvement in the transaction only serves to accentuate the prejudicial effect on the system. When one charged with the special responsibility of upholding the quality of justice attempts to buy a more favorable sentence for a criminal defendant, doubt is cast on our entire system of justice.

### Recommendation

The Board recommends that the Court enter an order:

1. Administering a public censure to Respondent pursuant to Section 4(a)(iii) of the Disciplinary Code for the Wyoming State Bar, for conduct prejudicial to the administration of justice;

2. Directing Respondent to undergo four (4) hours of continuing legal education in ethics on or before December 31, 2012;

3. Ordering Respondent to pay the $500 administrative fee required by Section 26(e) to the Wyoming State Bar on or before December 31, 2012; and

4. Ordering Respondent to reimburse the Wyoming State Bar for costs incurred in this matter in the amount of $11,897.60 on or before December 31, 2012.

DATED this 29th day of August, 2012.

BOARD OF PROFESSIONAL RESPONSIBILITY OF THE WYOMING STATE BAR

By /s/ Jenifer E. Scoggin
Jenifer E. Scoggin, Chair

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing was served by email and by United States Mail, first class postage prepaid, this 29th of august, 2012, to:

Mark Gifford

Wyoming State Bar Counsel

P.O. Box 109

Cheyenne, WY 82003

Thomas B. Jubin

P.O. Box 943

Cheyenne, WY 82003–0943

tom@jubinzerga.com

Counsel for Respondent

/s/